Filed 8/21/23  P. v. Delaloza CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B318526 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. |
| v. | VA045286-02) |
| ALEJANDRO REY DELALOZA, | |
| Defendant and Appellant. | |

APPEAL from a postjudgment order of the Superior Court of Los Angeles County, Roger Ito, Judge.  Affirmed.

Adrian K. Panton, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Zee Rodriguez, Supervising Deputy Attorney General, and Charles S. Lee, Deputy Attorney General, for Plaintiff and Respondent.

—————————————

A jury convicted Alejandro Rey Delaloza in December 1999 of two counts of first degree murder with a multiple-murder special-circumstance finding, conspiracy to commit murder and several other serious felonies.  Following an evidentiary hearing pursuant to Penal Code section 1172.6, subdivision (d)(3),[1] the superior court denied Delaloza's petition for resentencing, finding beyond a reasonable doubt that Delaloza was guilty of the first degree murder of the two victims under a currently valid theory of murder and was also guilty beyond a reasonable doubt of conspiracy to commit murder.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1. *Delaloza's Murder Convictions*

Michael Murillo and Brian Molina were shot to death at close range in the early morning of October 24, 1997 as they slept on the back patio of a home in Whittier.  The evidence at Delaloza's trial established that the murders had been committed by Richard Penunuri, a member of the Eastside Whittier Cole Street criminal street gang, who mistook the victims for two other men, Carlos Arias and Luke Bissonnette.[2]

Several hours before the murders (shortly before midnight on October 23, 1997) Delaloza, Penunuri and two or three other members of the Cole Street gang assaulted and robbed several

---

[1]     Statutory references are to this code.

[2]     Although the People and Delaloza dispute what reasonable inferences may be drawn from the evidence presented at trial as they relate to Delaloza's culpability, there is no significant disagreement about Delaloza's participation with Penunuri in the events leading up to, and immediately after, the murders of Murillo and Molina.

men in a supermarket parking lot. One of their victims testified Penunuri brandished a gun, later shown to be consistent with the murder weapon. According to this witness, Delaloza, who had robbed another of the victims at knifepoint, was not with Penunuri when the firearm was displayed.

Approximately two hours later, Bissonnette and Arias were sitting on the hood of a car in the driveway of the home of Bissonnette's maternal grandfather on Hornell Street when Delaloza and Penunuri drove up in Delaloza's car and parked across the street. Penunuri got out of the car and stated his gang affiliation as he approached Bissonnette. Bissonnette feared for his life because he believed Penunuri thought Bissonnette had left the Cole Street gang and was associating with a different gang.[3] When Penunuri told Bissonnette to come with him to Delaloza's car, Bissonnette ran and hid. Similarly, Arias told the police that Penunuri said things as he approached Bissonnette in the driveway that Arias believed indicated Penunuri intended to harm both Bissonnette and Arias, causing both men to run. Just before he ran, Arias saw Penunuri pointing a gun at him. Penunuri chased him a short way but did not catch up to him. After Penunuri and Delaloza left about 15 minutes later, Bissonnette returned to his home, which was nearby on Goodhue Street.

Bissonnette's mother, who was sleeping at the Hornell Street house with her grandchildren, testified she was

---

[3] Bissonnette explained, because he and Penunuri knew each other and he knew Penunuri was a member of Eastside Whittier Cole Street, he understood Penunuri's identification of his gang affiliation to mean that Penunuri was accusing him of associating with a rival gang.

awakened by a loud noise around 2:30 a.m., looked outside through a window and saw what appeared to be several men walking back and forth and also saw Delaloza's car. Opening the front door, she initially saw Delaloza on the front walkway of the house. Penunuri and a third individual came forward. When she asked what they were doing, Penunuri responded by asking her if she had seen Arias and told her he was looking for "them." Penunuri then clarified he was looking for Bissonnette, not Bissonnette's brother. Delaloza was standing only two or three feet from Penunuri, near enough to the conversation to hear what was being said.

When Bissonnette arrived home, Molina and Murillo were asleep on the back patio. The patio was dark. Molina had a sweatshirt covering his face. Bissonnette went inside and prepared to go to bed. Approximately 30 minutes later Bissonnette heard numerous, rapidly fired gunshots. After the shooting stopped, he looked out the bedroom window and saw Penunuri running down the street. Neighbors who heard the shots and looked out their windows testified they saw a car matching the description of Delaloza's driving away very slowly (approximately five miles per hour). One witness testified she saw the car stop at the corner and someone get out of the passenger's side of the car before it left the area.

A sheriff's department firearms examiner who responded to the Goodhue Street crime scene the morning of the murders recovered 11 expended nine-millimeter cartridge cases, seven expended nine-millimeter bullets or bullet fragments and one live nine-millimeter round from the backyard. He testified all the expended cartridge cases and bullets had been fired from the same gun.

A witness to the robberies in the parking lot supplied police with the license plate number of the car used by the perpetrators, which led the police to Delaloza. After Delaloza was arrested, a search of his house uncovered a box of nine-millimeter ammunition in the bedroom. There were 41 rounds in the box, which held 50 rounds. The firearms examiner determined one of the bullets in the box had been loaded and then ejected from the same gun used in the murders.

In a tape-recorded statement played to the jury, Delaloza initially denied any involvement in the parking lot robberies or the murders of Molina and Murillo. He claimed he was at home asleep when those crimes were committed. Confronted with his father's statement he did not return home until 3:45 a.m., Delaloza admitted driving Penunuri to Bissonnette's Goodhue Street house between 3:00 and 4:00 a.m. According to Delaloza, Penunuri wanted to speak to a former girlfriend named Monique who lived there. Penunuri believed Monique might be up at that early hour since she had a baby. Delaloza parked just down the street from Bissonnette's house (which he described as "right before the turn" in the street) and waited in the car while Penunuri went to talk to Monique.

According to his statement, when Delaloza heard gunshots, he started to leave thinking someone was shooting at Penunuri. As Delaloza drove away, Penunuri ran to the car and jumped in saying, "Let's go, man." Penunuri did not tell Delaloza what had happened at Bissonnette's house, and Delaloza did not ask as he drove Penunuri home. Delaloza insisted he did not see Penunuri with a gun at any time during the evening.

Gang experts testified for both the prosecution and Delaloza. Delaloza's expert (the only witness called by the

5

defense) testified, when a vehicle is used for a gang-related drive-by-type shooting, the gang members would typically try to prevent the vehicle from being linked to one of them, both by concealing the license plate (or using a stolen one) and disposing of the vehicle after the shooting. He acknowledged a gang member might help another commit a crime if he knew it was happening and that the more "hard core" the individual was, the more likely he was to participate. He agreed Delaloza's Cole Street tattoos indicated he had been "very, very loyal to the gang and it was important to him." However, based on a hypothetical similar to the evidence in the case, the expert did not believe the driver of the car necessarily knew his passenger was going to shoot anyone at the Goodhue Street house.

The prosecution's expert (testifying only in the People's rebuttal case) testified a gang member in a car who was armed would usually pass the firearm around for discussion, particularly if it was intended that the gun would be used in a crime that was about to occur, explaining, "[T]hen they know exactly what's going on, who is going to hold it, and, you know, all the—that's going on with that crime." Given a lengthy hypothetical based closely on the testimony, the expert opined that the individual waiting in the car would know "what was going to go down at the Goodhue address where [Bissonnette] lived." Discussing in particular that the driver left the area very slowly after the shooting, the expert explained, "It seems pretty clear to me that it was set up in advance. I mean, if a car is parked down the street and then shots are fired and then he cruises down another area around a corner where he picks up another individual, how would that individual know he was going to get picked up there unless that was preplanned."

6

The jury convicted Delaloza of conspiracy to commit murder (§ 182, subd. (a)(1)) and on two counts of murder (§ 187, subd. (a)) with true findings on the multiple-murder special-circumstance (§ 190.2, subd. (a)(3)) and principal-armed-with-a firearm allegations (§ 12022, subd. (a)(1)).[4] The jury also found Delaloza guilty of robbery (§ 211) and aggravated assault (§ 245, subd. (a)(1)) in connection with the supermarket parking lot incident. The court sentenced Delaloza to an indeterminate state prison term of life without parole plus 29 years to life.

2. *Delaloza's Direct Appeal*

We affirmed the judgment on appeal. (*People v. Delaloza* (June 6, 2001, B140454) [nonpub. opn.] (*Delaloza I*).) In rejecting Delaloza's contention the evidence was insufficient to support his convictions for murder and conspiracy to commit murder, we emphasized that, to convict Delaloza of murder as an aider and abettor, the People did not need to prove he knew Penunuri intended to kill Arias and Bissonnette: "Proof defendant knew Penunuri intended an assault with a deadly weapon would be sufficient under the natural and probable consequences doctrine." Similarly, to convict Delaloza of conspiracy to commit murder, "the People had to prove beyond a reasonable doubt defendant entered into an agreement with Penunuri to commit that offense or another offense, such as assault, of which murder was a natural and reasonable consequence." Although there was no

---

[4] The court had instructed the jury in part with CALJIC No. 3.01 defining aiding and abetting and gave CALJIC No. 3.02 (6th ed. 1997) explaining liability for natural and probable consequences. For the special-circumstance allegations, the court used a redacted and, as a result, rather garbled version of CALJIC No. 8.80.1 (6th ed. 1997).

direct evidence Delaloza knew Penunuri intended to assault or kill Arias and Bissonnette and conspired or aided and abetted Penunuri in the commission of either offense, we held the evidence was sufficient for the jury to find, "when defendant drove Penunuri to Bissonnette's home that evening, he knew Penunuri intended to commit an assault on Bissonnette or Arias or both." Accordingly, we affirmed his convictions for murder and conspiracy under the natural and probable consequences doctrine.

3. *Delaloza's Petition for Resentencing*

Delaloza, represented by the alternate public defender, filed a petition for resentencing under section 1172.6 (former section 1170.95) in February 2019. After receiving memoranda from the district attorney and Delaloza's counsel, the superior court denied the petition, finding Delaloza had failed to make a prima facie showing of eligibility for relief.

We reversed the order denying Delaloza's petition, explaining the record of conviction failed to demonstrate, as a matter of law, the basis for the jury's verdict—that is, that it indisputably established the jury found Delaloza guilty as a direct aider and abettor of Penunuri's murder of Molina and Murillo—and thus that Delaloza was necessarily ineligible for resentencing relief. (*People v. Delaloza* (Aug. 12, 2021, B300210) [nonpub. opn.] (*Delaloza II*).) We remanded the matter with directions to the superior court to issue an order to show cause and to conduct further proceedings in accordance with former section 1170.95, subdivision (d).

The superior court on remand issued an order to show cause on October 26, 2021 and set the matter for an evidentiary hearing. At the hearing on February 17, 2022 the court stated it

8

had read and considered the entire trial transcript and confirmed that neither Delaloza nor the district attorney had any additional evidence to introduce.

After hearing argument of counsel and reviewing the evidence at trial, the court denied the petition. Concluding the only reasonable interpretation of the circumstantial evidence was that Delaloza knew what Penunuri was going to do when he went into the house, the court found "beyond a reasonable doubt that Mr. Delaloza was in fact guilty of the crime of first degree murder as to both the victims in this case, Brian Molina and Mike Murillo."

Delaloza filed a timely notice of appeal.

## DISCUSSION

1. *Accomplice Liability for Murder and Section 1172.6*

Under the ameliorative changes to the law relating to accomplice liability for murder effected by Senate Bill No. 1437 (Stats. 2018, ch. 1015), malice must be proved to convict a principal of murder except under the narrowed felony-murder rule set forth in section 189, subdivision (e), and may not be imputed based solely on an individual's participation in a crime (§ 188, subd. (a)(3)), thereby eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Gentile* (2020) 10 Cal.5th 830, 842-843; see *People v. Reyes* (2023) 14 Cal.5th 981, 984). The amended felony-murder provision requires the People to prove specific facts relating to the defendant's individual culpability: The defendant was the actual killer (§ 189, subd. (e)(1)); although not the actual killer, the defendant, with the intent to kill, assisted in the commission of murder in the first degree (§ 189, subd. (e)(2)); or the defendant was a major participant in an underlying felony

9

listed in section 189, subdivision (a), and acted with reckless indifference to human life, "as described in subdivision (d) of Section 190.2," the felony-murder special-circumstance provision (§ 189, subd. (e)(3)). (See *People v. Strong* (2022) 13 Cal.5th 698, 708.)

Section 1172.6 authorizes an individual convicted of felony murder or murder based on the natural and probable consequences doctrine or any other theory under which malice is imputed based solely on that person's participation in a crime to petition the sentencing court to vacate the conviction and be resentenced on any remaining counts if he or she could not now be convicted of murder because of these changes to the law relating to accomplice liability for murder. As amended by Senate Bill No. 775 (Stats. 2021, ch. 551, § 2), effective January 1, 2022, Senate Bill No. 1437's ameliorative changes to the law of murder and section 1172.6's provisions for resentencing relief now expressly apply to individuals convicted of attempted murder and voluntary manslaughter.

If, as here, the petitioner makes the requisite prima facie showing he or she falls within the provisions of section 1172.6 and is entitled to relief, the court must issue an order to show cause and hold an evidentiary hearing to determine whether to vacate the murder, attempted murder or voluntary manslaughter conviction and resentence the petitioner on any remaining counts. (§ 1172.6, subd. (d)(1).)

At the evidentiary hearing to determine whether the petitioner is entitled to relief, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189

made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) The court may consider evidence "previously admitted at any prior hearing or trial that is admissible under current law," including witness testimony. The petitioner and the prosecutor may also offer new or additional evidence. (*Ibid.*) The superior court's decision to deny the petition after an evidentiary hearing, if the court correctly understood the elements of the offense and the proper standard and burden of proof were applied, is reviewed for substantial evidence. (*People v. Reyes*, *supra*, 14 Cal.5th at p. 988; *People v. Vargas* (2022) 84 Cal.App.5th 943, 951; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 985; *People v. Hernandez* (2021) 60 Cal.App.5th 94, 113.)

> 2. *Substantial Evidence Supports the Finding That Delaloza Acted with Express Malice When Aiding the Murders of Molina and Murillo*

"An aider and abettor's guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's own acts and own mental state. Once it is proved that the principal has caused an actus reus, the liability of each of the secondary parties should be assessed according to his own mens rea. Thus, proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea— knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225 [cleaned up]; accord, *People v. Gentile*, *supra*, 10 Cal.5th at p. 843 ["under direct aiding and abetting principles, an accomplice is guilty of an offense

11

perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends'"].)

On appeal Delaloza emphasizes, although the superior court found, based on circumstantial evidence, that Delaloza knew Penunuri's intent—what Penunuri was going to do when he went into the back of Bissonnette's Goodhue Street home—there was no express finding that Delaloza acted with the intent to assist Penunuri in committing those crimes and no specific finding of "express malice." Absent those findings, Delaloza argues, the evidence did not establish he was guilty of murder under section 188 as amended by Senate Bill No. 1437. And in a single sentence without further elaboration, Delaloza also contends it would not be reasonable to infer he acted with the specific intent to kill based solely on his knowledge that Penunuri was armed and that he intended to kill Bissonnette and Arias.[5]

Neither argument has merit. Section 1172.6, subdivision (d)(3), only requires the superior court to determine whether the prosecutor has proved beyond a reasonable doubt

---

[5] Delaloza does not suggest the fact that Penunuri mistakenly killed Molina and Murillo, rather than Bissonnette and Arias, has any bearing on his culpability as a direct aider and abettor of the murders. (Cf. *People v. Bland* (2002) 28 Cal.4th 313, 332 [CALJIC No. 8.65 correctly instructs, when a defendant attempted to kill a certain person but by mistake or inadvertence killed a different person, the crime committed, if any, is the same as though the person originally intended to be killed had been killed]; see also CALCRIM No. 562 [containing substantially the same language as CALJIC No. 8.65].)

that the petitioner is guilty of murder (or, when applicable, attempted murder) under sections 188 and 189 as amended effective January 1, 2019.  The court has no obligation to make specific findings as to any of the elements of murder.  The superior court here fully complied with this limited duty, clearly finding both orally at the conclusion of the evidentiary hearing and in its written minute order Delaloza was guilty beyond a reasonable doubt of the first degree murders of Molina and Murillo under a currently valid theory of accomplice liability for murder.  (Cf. *People v. Camacho* (2022) 14 Cal.5th 77, 123 ["we review the trial court's ruling, 'not the court's reasoning and, if the ruling was correct on any ground, we affirm'"]; *People v. Zapien* (1993) 4 Cal.4th 929, 976 [a decision correct in law will not be disturbed on appeal because given for a wrong reason].)

Ample circumstantial evidence, much of which the superior court summarized as it explained its reasons for denying Delaloza's petition, supported the court's express and implied findings that Delaloza was a direct aider and abettor of the murders, acting with knowledge of Penunuri's unlawful intent and with an intent to assist Penunuri in accomplishing his goal. Initially, as the court detailed, Delaloza and Penunuri (with two or three confederates) acted in concert during the parking lot assault and robberies and left together in Delaloza's car, lending credence to the prosecutor's theory the two good friends and fellow gang members were also actively working together during the early morning hours when Penunuri, after arriving at the Hornell Street house with Delaloza in Delaloza's car, confronted Bissonnette and Arias and then continued searching for them at Bissonnette's Goodhue Street home.

13

In addition, Penunuri brandished his gun during the robberies and then again several hours later at the Hornell Street house. Although, as the superior court acknowledged, there was no direct evidence Delaloza saw Penunuri display the firearm on either occasion, it was reasonable for the court to infer Delaloza knew Penunuri was armed based on his proximity to Penunuri during those encounters, as well as the forensic evidence that strongly suggested Delaloza had given Penunuri the ammunition that was used to kill Molina and Murillo.

The trial evidence, viewed in the light most favorable to the order denying Delaloza's petition (see, e.g., *People v. Navarro* (2021) 12 Cal.5th 285, 303), also established that Bissonnette thought his life was in danger because of Penunuri's apparent belief that Bissonnette had left Cole Street and was associating with a rival gang (as Bissonnette testified). After driving Penunuri to the Hornell Street house, where Penunuri confronted Bissonnette and Arias, Delaloza heard Penunuri tell Bissonnette's mother that Penunuri was looking for the two men (and not Bissonnette's brother). Delaloza then drove Penunuri to Bissonnette's home on Goodhue Street, where he parked so his car was not readily visible, rather than directly in front of the house.

Finally, as the superior court discussed, Delaloza waited in his parked car while Penunuri went to the house through the backyard. Delaloza then heard gunshots. Although claiming to sheriff's investigators that he thought someone had been shooting at Penunuri, when Penunuri came back to the car, Delaloza drove away very slowly.

This evidence, considered in its entirety, rationally supported a finding not only that Delaloza knew Penunuri

intended to find and kill Bissonnette and Arias but also that Delaloza actively assisted Penunuri in carrying out that intent by driving him to the Goodhue Street house after the initial confrontation at the Hornell Street house and then waiting to act as the get-away driver after Penunuri mistakenly shot Molina and Murillo. (See *People v. Clements* (2022) 75 Cal.App.5th 276, 298 ["[w]hile the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt"].)

3. *Our Prior Opinions Do Not Preclude a Finding of Malice*

Delaloza also contends our decisions in *Delaloza I* affirming his convictions for murder and conspiracy to commit murder under the natural and probable consequences doctrine and *Delaloza II* finding he had made a prima facie showing of eligibility for resentencing relief under section 1172.6 established that the evidence at trial—and, therefore, the evidence before the superior court at the section 1172.6, subdivision (d)(3), evidentiary hearing—was insufficient to support convictions for murder that require a finding Delaloza acted with express malice. Accordingly, he argues, the superior court's contrary (implicit) finding was barred by law of the case and collateral estoppel (issue preclusion).

The premise for Delaloza's argument is incorrect. In *Delaloza I* the People had argued the jury could infer Penunuri intended to assault or kill Arias and Bissonnette and conspired or aided and abetted Penunuri in the commission of those crimes from circumstantial evidence in the trial record including the

15

group character of gangs, as explained by the prosecution's gang expert.  Our opinion questioned whether it was reasonable to infer how a member of a group acted on a particular occasion based on expert testimony, even if accurate, about the tendencies of members of the group to act in certain ways.[6]  Nonetheless, we did not address what weight (if any) to give that evidence in Delaloza's case—an issue not presented by Delaloza on appeal— because, we held, even without the expert testimony, there was sufficient evidence to uphold the convictions for murder and conspiracy to commit murder under the natural and probable consequences doctrine with an assault on Bissonnette or Arias or both as the target offense.  The opinion did not suggest, let alone hold, that the evidence—with or without the gang testimony— was insufficient to support a finding of express malice:  It was simply unnecessary to reach that point given the applicability of the natural and probable consequences doctrine.[7]

---

[6]     Several years before the decision in *Delaloza I* the Supreme Court in *People v. Gardeley* (1996) 14 Cal.4th 605, 617 had upheld the use of expert opinion testimony concerning the culture and habits of criminal street gangs.  And 10 years after *Delaloza I* the Supreme Court in *People v. Vang* (2011) 52 Cal.4th 1038, 1047, explaining that "'there is a difference between testifying about specific persons and about hypothetical persons,'" held answers to hypothetical questions based on other evidence in the case—as the People's gang expert gave at Delaloza's trial— were "'probative, not inadmissible.'"  (Accord, *People v. Gonzalez* (2006) 38 Cal.4th 932, 946, fn. 3.)

[7]     Contrary to Delaloza's argument, we did not hold the evidence in the record considered as a whole was insufficient to establish Penunuri and Delaloza planned the murders together,

The opinion in *Delaloza II* was even more explicit. Defending the superior court's ruling that the record of conviction established Delaloza's ineligibility for resentencing relief as a matter of law, the Attorney General argued the true finding on the multiple-murder special-circumstance allegation necessarily meant the jury found Delaloza, although not the actual killer, had aided or assisted in the commission of first degree murder with the intent to kill.[8] Our opinion agreed the Attorney General would be correct if Delaloza's jury had been properly instructed; but, we explained, the modified instruction given by the trial court was "essentially nonsensical." "Perhaps," we suggested, "the jury was sufficiently insightful to decode the correct import of CALJIC No. 8.80.1, notwithstanding the trial court's multiple errors when using it." But, we concluded, we were not prepared to attribute any meaning as a matter of law to the jury's true finding. Stated slightly differently, we held the jury might well have found Delaloza guilty as a direct aider and abettor of Penunuri's murder of Murillo and Molina—a conclusion neither mandated nor precluded by our opinion in *Delaloza I*—but that was not indisputably established by the record of conviction. Instead, we held, whether the evidence proved beyond a reasonable doubt Delaloza was a direct aider and abettor of the murders had to be determined (as it subsequently was) at an evidentiary hearing under section 1172.6, subdivision (d)(3).

only that it was not reasonable to infer that they did so based solely on the expert's testimony of gang tendencies.

[8]    Delaloza in his direct appeal did not challenge the sufficiency of the evidence to support the special-circumstance finding. That issue was not addressed in *Delaloza I*.

17

In sum, whatever significance the doctrines of law of the case and issue preclusion may have in determining eligibility for resentencing relief under section 1172.6, they are irrelevant to the superior court's decision in Delaloza's case.

**DISPOSITION**

The postjudgment order denying Delaloza's petition for resentencing is affirmed.


PERLUSS, P. J.


We concur:


SEGAL, J.


FEUER, J.